**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| UNITED STATES OF AMERICA, | 3:19-CV-737-MMD-CLB |
|---|---|
| Plaintiff, | **Default Judgment of Forfeiture and Final Judgment of Forfeiture** |
| v. | |
| $34,000.00 in United States Currency, | |
| Defendant. | |

**I.  FACTS**

On July 23, 2019, at approximately 9:45 A.M., David William Inglis was driving a grey 2006 Ford sedan bearing a Kansas license plate on Interstate 80 westbound in Washoe County, Nevada. Inglis was the sole occupant of the vehicle.

A Washoe County Sheriff's Office (WCSO) officer, who was inside of his stationary patrol vehicle, observed the Ford following another vehicle at approximately one-and-one-half car's lengths. The officer pulled out and caught up with the Ford and, then, observed the vehicle pass over the fog line two times within a short distance.

The WCSO officer initiated a traffic stop for the following violations of Nevada law: Following Too Closely and Failure to Maintain Lane.

The WCSO officer approached the Ford and advised Inglis of the reasons for the stop. Inglis identified himself with a Kansas driver's license and motorcycle license.

While gathering paperwork to give to the WCSO officer, Inglis stated that he was traveling to Sacramento, California to attend the wedding of his daughter's childhood friend. When asked when the wedding was to occur, Inglis answered that it was a "few" days away.

The WCSO officer asked Inglis to exit the vehicle while the officer completed a warning citation, and Inglis did so.

While completing a warning citation and submitting a wants-and-warrants check, the WCSO officer engaged Inglis in conversation.

Inglis stated that he used to live in California but moved to Kansas to raise horses on a ranch. When the officer asked where in California Inglis had lived, he replied that he had worked for the State Department and lived in San Luis Obispo, California.

When asked about the location of the wedding, Ingis stated that he did not yet know. When asked where in Sacramento he would be staying, Inglis again stated that he did not know, and he commented that he would find a hotel when he arrived.

At this juncture, a Nevada Highway Patrol (NHP) officer arrived on scene to provide backup to the WCSO officer. The WCSO officer asked Inglis whether the Ford contained any drugs, weapons, or large amounts of currency. Inglis responded in the negative.

The WCSO officer asked the NHP officer to continue to work on the warning citation.

The NHP officer deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine alerted to the presence of the odor of illegal drugs coming from the Ford.

The NHP officer returned his canine to his vehicle and advised Inglis that based on the positive canine alert on the Ford the officer would be conducting a probable-cause search of the vehicle. The WCSO officer again asked Inglis whether the vehicle contained any drugs, weapons, or large amounts of currency, and Inglis again responded in the negative. Another WCSO officer arrived on scene, and he assisted the lead WCSO officer with the search of the Ford.

Inside the trunk, investigators discovered a paper bag containing a tied-off white plastic bag. Within the plastic bag, investigators found numerous bundles of United States currency. The bundles were secured with rubber bands and appeared to be of similar

amounts. Based on his training and experience, the lead WCSO officer believed that the currency's packaging was consistent with illegal-drugs trafficking.

The lead WCSO officer engaged Inglis in further conversation. When asked to identify how much money was in the bag, Inglis said: "I don't know, about $20,000 maybe." When asked whether the Ford contained any additional currency, Inglis replied that there was additional currency in his suitcase, totaling approximately $10,000. Inglis asserted that all of the money found in the vehicle belonged to him.

The lead WCSO officer returned to the Ford and discovered a small black bag in the trunk. Inside the black bag was a smaller bag that, in turn, contained two additional, rubber-banded bundles of currency, which appeared to be smaller than the bundles found in the main cache. It is common for individuals transporting currency in the drugs trade to separately label, earmark, and/or package the portion of the currency that represents their transport payment. Along with the bundles of currency was a plastic zipped bag filled with loose rubber bands.

The lead WCSO officer again engaged Inglis in conversation. When asked what he intended to do with the currency, Inglis replied that he might use it to buy horses in California. He was unable to identify any individual who he might meet about buying horses.

In addition to the currency, the search of the Ford uncovered the following items: (a) a black BB gun styled to look like a real handgun; (b) a black cane containing a sword insert; (c) small scales, one of which had white residue on it; (d) an Oasis electronic thermo hygrometer; (e) camping equipment; and (f) a $300 money order and receipts for other money orders.

At approximately 10:18 A.M., a DEA agent arrived on scene to assist with the investigation. The DEA agent engaged Inglis in consensual conversation.

When asked about the details of his trip, Inglis stated that he was driving from Colby, Kansas to Sacramento, California to attend a wedding and possibly purchase some horses. Inglis communicated that he often bought, sold, trained, and boarded horses.

When asked whether his vehicle contained any large amounts of currency, Inglis stated that he had approximately $30,000. Earlier, Inglis had twice denied to the lead WCSO officer that he had any large amounts of currency in the Ford.

When asked about the source of the currency, Inglis initially said that it was retirement money but, then, stated that it was also his life savings.

When asked about whether he utilized a bank, Inglis responded that he had a bank account but only kept approximately $2,000 in that account. He further stated that he kept most of his money, in the form of cash, in a safe deposit box in Boulder, Colorado, where his daughter lived. Inglis said that the safety deposit box had "a lot more money in it."

When asked about his prior employment, Inglis stated that he had been employed by NATO. The DEA agent asked for further details, at which point Inglis said that he had actually been employed by a contracting agency that had "loaned him out" to NATO. Inglis admitted that he did not receive retirement benefits from any federal agency. When conversing with the lead WCSO officer, Inglis had initially stated that he had been employed by the State Department.

When asked to provide further details about the wedding that Inglis claimed that he was attending, he said that the woman getting married was a close friend of his daughter. The DEA agent asked Inglis for the bride's name, and Inglis initially stated that he could not remember. The DEA agent then asked Inglis why he would have travelled so far to attend a wedding when he did not know the name of the bride, at which point Inglis provided a name. The DEA agent further asked Inglis where the wedding was being held. Inglis initially stated that he did not know before asserting that it was actually going to be held in Oregon, though he could not say where in Oregon. Up to this point, Inglis had maintained that he was headed to Sacramento, California to attend the wedding.

Inglis indicated that his daughter would be joining him at the wedding. When the DEA agent asked Inglis whether his daughter could corroborate his story, Inglis responded affirmatively. The agent asked for the daughter's phone number so that he could ask her

/ / /

4

about numerous topics, including the purported wedding and the horse business, but Inglis refused to provide the number.

When asked whether he could produce documentation demonstrating his involvement in the horse business, Inglis said that he had no such documents. Inglis identified his business as Big Sky Stables in Colby, Kansas. Upon further investigation, the DEA agent was unable to verify the existence of such a business. Investigators found a number of internet printouts in the Ford displaying horses for sale, but most of the ads were from 2016 and 2017 and related to horses that appeared to be stabled in the Midwestern and Southeastern United States.

While the DEA agent conversed with Inglis, a WCSO officer placed the currency along the roadside in the brush. An NHP officer, who had not seen where the currency was placed, deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine was a different canine than the canine that had been deployed in the vicinity of the Ford. The canine found the currency and alerted to the odor of illegal drugs coming from it.

At the conclusion of the traffic stop, the DEA seized the currency.

A later official bank count determined that the currency totaled $34,000. It was composed of the following:

    a. $20 in $10 bills (2 bills);

    b. $23,880 in $20 bills (1,194 bills);

    c. $100 in $50 bills (2 bills); and

    d. $10,000 in $100 bills (100 bills).

Subsequent investigation revealed that Inglis had two prior convictions for illegal-drugs offenses. In 1986, Inglis was convicted of Conspiracy to Distribute Marijuana and Conspiracy to Manufacture or Possess a Drug With Intent to Distribute.

When Inglis submitted his administrative claim, he provided a statement. In it, Inglis contended that the seized currency had left him "virtually penniless." When speaking

/ / /

to the DEA agent on the day of the seizure, Inglis had asserted that his safety deposit box in Boulder had "a lot more money in it."

The $34,000 in United States currency is the entirety of the defendant currency

## II. PROCEDURE

On December 11, 2019, the United States filed a verified Complaint for Forfeiture in Rem, ECF No. 1, alleging the $34,000 (defendant property):

   a. is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

   b. is all proceeds traceable to an exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

   c. is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

   d. is any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), or a conspiracy to commit such offense, and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

On December 23, 2019, the Court entered an Order for Summons and Warrant of Arrest in Rem for the Property and Notice, ECF No. 4, and the Clerk issued the Summons and Warrant of Arrest in Rem, ECF No. 5.

Pursuant to the Order, ECF No. 4, the following documents were served on the defendant property and all persons or entities who may claim an interest in the defendant property: the Complaint, ECF No. 1, the Order, ECF No. 4, the Summons and Warrant, ECF No. 5, and the Notice of Complaint for Forfeiture. Notice was published according to law.

Pursuant to Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions (Fed. R. Civ. P. Supp. Rule) G(5), all persons interested in the defendant property were required to: (1) file a verified claim, setting forth the person's or its interest in the property, that (a) identified the specific property claimed, (b) identified the claimant and stated the claimant's interest in the property, and (c) was signed by the claimant under penalty of perjury pursuant to 28 U.S.C. § 1746; (2) file the verified claim with the Clerk of the above-entitled Court no later than 35 days after the notice was sent or, if direct notice was not sent, no later than 60 days after the first day of publication on the official internet government forfeiture site, www.forfeiture.gov; (3) file an answer to the Complaint for Forfeiture in Rem or a motion under Rule 12 with the Clerk of the Court, Bruce R. Thompson U.S. Courthouse and Federal Building, 400 South Virginia Street, 3rd Floor, Reno, Nevada 89501, no later than 21 days after filing the verified claim; and (4) serve a copy of the verified claim and the answer at the time of each filing on James A. Blum, Assistant United States Attorney, 501 Las Vegas Boulevard South, Suite 1100, Las Vegas, Nevada 89101. Complaint, ECF No. 1; Order for Summons and Warrant, ECF No. 4; Summons and Warrant, ECF No. 5.

On January 21, 2020, the United States Marshals Service served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest by executing them on the defendant property. Notice of Filing Take into Custody, ECF No. 6.

Public notice of the forfeiture action and arrest was given to all persons and entities by publication via the official internet government forfeiture site, www.forfeiture.gov, from

1  January 14, 2020, through February 12, 2020. Notice of Filing Proof of Publication, ECF
2  No. 7.
3         On January 17, 2020, the United States Attorney's Office served and attempted to
4  serve David William Inglis by regular and certified return receipt mail, respectively, with
5  the Complaint for Forfeiture in Rem, the Order for Summons and Warrant of Arrest for
6  the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and
7  the Notice of Complaint for Forfeiture and Arrest. The certified mail was returned as
8  unclaimed but the regular mail was not. Notice of Filing Service of Process, ECF No. 8-1,
9  p. 3, 6-7, 9-25, 27-31.
10        On January 17, 2020, the United States Attorney's Office served and attempted to
11 serve David William Inglis by regular and certified return receipt mail, respectively, with
12 the Complaint for Forfeiture in Rem, the Order for Summons and Warrant of Arrest for
13 the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and
14 the Notice of Complaint for Forfeiture and Arrest. The certified mail was returned as
15 unclaimed but the regular mail was not. Notice of Filing Service of Process, ECF No. 8-1,
16 p. 3, 6-7, 9-25, 32-35.
17        On January 17, 2020, the United States Attorney's Office served and attempted to
18 serve Grace McGiltha Inglis by regular and certified return receipt mail, respectively, with
19 the Complaint for Forfeiture in Rem, the Order for Summons and Warrant of Arrest for
20 the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and
21 the Notice of Complaint for Forfeiture and Arrest. The certified mail was returned as
22 unclaimed but the regular mail was not. Notice of Filing Service of Process, ECF No. 8-1,
23 p. 3, 6-7, 9-25, 36-40.
24        On January 17, 2020, the United States Attorney's Office served the Daughter of
25 David William Inglis by regular and certified return receipt mail with the Complaint for
26 Forfeiture in Rem, the Order for Summons and Warrant of Arrest for the Property and
27 Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of
28 / / /

8

Complaint for Forfeiture and Arrest. Notice of Filing Service of Process, ECF No. 8-1, p. 3-4, 6-7, 9-25, 41-43.

No person or entity has filed a claim, answer, or responsive pleading within the time permitted by 18 U.S.C. § 983(a)(4) and Fed. R. Civ. P. Supp. Rule G(4) and (5).

David William Inglis is not in the military service within the purview of the Servicemembers Civil Relief Act. Exhibit 1.

Grace McGiltha Inglis is not in the military service within the purview of the Servicemembers Civil Relief Act. Exhibit 2.

David William Inglis is neither a minor nor an incompetent person.

Grace McGiltha Inglis is neither a minor nor an incompetent person.

On March 9, 2020, the United States filed a Motion for Entry of Clerk's Default against David William Inglis in the above-entitled action. Motion for Entry of Clerk's Default, ECF No. 9.

On March 10, 2020, the Clerk of the Court entered a Default against David William Inglis in the above-entitled action. Entry of Clerk's Default, ECF No. 10.

On March 30, 2020, the United States filed a Motion for Entry of Clerk's Default against the $34,000, Grace McGiltha Inglis, the Daughter of David William Inglis, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Motion for Entry of Clerk's Default, ECF No. 11.

On March 31, 2020, the Clerk of the Court entered a Default against the $34,000, Grace McGiltha Inglis, the Daughter of David William Inglis, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Entry of Clerk's Default, ECF No. 12.

### III. The Requirements for Default were met.

#### A. Legal Standard

Civil forfeiture cases have five requirements that must be fulfilled to complete a default: (1) the judgment sought does not differ in kind from, or exceed in amount, what is demanded in the pleadings pursuant to Fed. R. Civ. P. 54(c); (2) the Clerk of the Court has

9

entered default for a sum certain pursuant to Fed. R. Civ. P. 55(b)(1); (3) publication and personal service were completed pursuant to Fed. R. Civ. P. Supp. Rule G(4); (4) the Complaint is legally sufficient to support a reasonable belief that the government will be able to meet its burden of proof pursuant to Fed. R. Civ. P. Supp. Rule G(2), *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir. 1988); and (5) no person has filed a claim, or the claim(s) have been resolved under 18 U.S.C. § 983(a)(4)(A) or Fed. R. Civ. P. Supp. Rule G(5).

Civil cases that do not directly address forfeiture have seven factors that the Court must consider before entry of default: (1) the substantive merit of the plaintiff's claims; (2) the sufficiency of the complaint; (3) the amount of money at stake; (4) the possibility of prejudice to the plaintiff if relief is denied; (5) the possibility of disputes to any material facts in the case; (6) whether default resulted from excusable neglect; and (7) the public policy favoring resolution of cases on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); *SATA GmbH & Co. KG v. USA Italco Int'l Ltd.*, No. 3:18-CV-00351-MMD-WGC, 2019 WL 4601513, at *3 (D. Nev. Sept. 20, 2019); *Covenant Care California, LLC v. Shirk*, No. 217CV00956JADVCF, 2018 WL 3429669, at *1 (D. Nev. July 16, 2018).

For purposes of a default judgment, the well-pled allegations of the Complaint are taken as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987). Furthermore, upon default, the defendant's liability is conclusively established and the factual allegations in the Complaint, except those relating to damages, are accepted as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The power to grant or deny relief upon an application for default judgment is within the discretion of the Court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

**B. The Forfeiture Requirements for Default Were Met.**

    a. Judgment Sought

Pursuant to Fed. R. Civ. P. 54(c) and 55(b), the judgment by default does not "differ in kind from, or exceed [the] amount" of relief listed in the Complaint for forfeiture.

/ / /

10

b. Default and Entry of Default

As shown above, the United States requested entry of Clerk's Default against the $34,000, and all persons or entities who may claim an interest in the defendant property in the above-entitled action. ECF No. 9, 11. The Clerk entered the Default as requested. ECF No. 10, 12.

c. Notice

Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(a)(iv)(C), the United States published notice via the official internet government forfeiture site, www.forfeiture.gov, for thirty consecutive days. ECF No. 7. Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(b), the United States served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on all known potential claimants. Notice of Filing Service of Process, ECF No. 8.

d. Legal Sufficiency of the Complaint

The Complaint filed in this action was verified. The Court has subject matter jurisdiction, in rem jurisdiction over the defendant property, and venue. The Complaint described the property with reasonable particularity. The Complaint states where the seizure of the defendant property occurred and its current location. The Complaint identifies the statute under which the forfeiture action is brought. The Complaint alleges sufficiently detailed facts to support a reasonable belief that the United States will be able to meet its burden of proof at trial. Fed. R. Civ. P. Supp. Rule G(2); Complaint, ECF No. 1.

e. Status of Potential Claimants

No person or entity has filed a claim and the time to file a claim has passed.

**C. The Civil Requirements for Default Were Met.**

a. The Plaintiff Would be Prejudiced Without a Judgment

The government would be prejudiced if it were to try this case rather than obtain a default judgment, since a trial would require the additional expenditure of human and financial resources. These expenses and efforts are unnecessary because the Complaint

11

established sufficient evidence of the status and forfeitability of the defendant property, and that evidence is uncontested by David William Inglis, Grace McGiltha Inglis, and the Daughter of David William Inglis. *See United States v. $150,990.00 in U.S. Currency*, No. 2-12-CV-01014-JAD, 2014 WL 6065815, at *2 (D. Nev. Nov. 10, 2014), ("[T]he government would be prejudiced by having to expend additional resources litigating an action that appears to be uncontested. This factor favors default judgment.").

### b. & c. The Plaintiff's Claims are Meritorious and the Complaint is Sufficient.

As shown in the statement of the case above, the government has a clear case against the defendant property and the Complaint sufficiently alleges the facts of the case.

### d. The Amount of Money at Stake

The value of the defendant property at stake was clearly established in the Complaint, ECF No. 1, and the defendant property is forfeitable pursuant to 21 U.S.C. § 881(a)(6).

> Under the fourth *Eitel* factor, the court considers the amount of money at stake in relation to the seriousness of Defendants' conduct. Plaintiff has provided evidence that the currency, a sum of $24,000, was furnished or intended to be furnished in exchange for marijuana, a serious violation of federal law.
>
> *United States v. Twenty-Four Thousand Dollars ($24,000) in U.S. Currency*, No. 02:09-CV-2319-LRH, 2010 WL 2695637, at *3 (D. Nev. July 2, 2010) (quotation marks and citation omitted).

The Complaint alleges the serious crime of exchanging or intending to exchange moneys, negotiable instruments, securities, or other things of value for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*. The money at stake is the tainted currency related to a completed or contemplated illegal-drugs transaction in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*.

/ / /

/ / /

/ / /

e. <u>There Are No Possible Disputes of Material Fact</u>

No issues of material fact exist and the allegations of the Complaint are established as a matter of law. The property is subject to forfeiture because law enforcement can demonstrate that the defendant property:

    a. is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

    b. is all proceeds traceable to an exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

    c. is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

    d. is any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), or a conspiracy to commit such offense, and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C)

f. <u>Default Was Not the Result of Excusable Neglect</u>

The record shows that the claimant and potential claimants were properly served with the Complaint, Order, Summons and Warrant, and the Notice and failed to file a claim and answer to the Complaint. There is no evidence of excusable neglect.

/ / /

g. Public Policy Does not Prevent Default Judgment

Under Fed. R. Civ. P. 55(b), default judgments are allowed. Here, the claimant and potential claimants did not file a claim and an answer to the government's Complaint.

> While the Federal Rules do favor decisions on the merits, they also frequently permit termination of cases before the court reaches the merits. As F.R.C.P. 55 indicates, one such instance is when a party fails to defend against an action, which is exactly what [claimant(s)] failed to do in this case. Thus, the preference to decide cases on the merits does not preclude a court from granting default judgment.
>
> *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996).

Denying the government's motion would not further public policy. While cases should be decided on the merits when possible, the claimant and potential claimants have not contested the facts of the Complaint or the forfeiture of the defendant property, which makes a decision on the merits impractical. Therefore, a final default judgment of forfeiture is appropriate. *See Covenant Care California*, 2018 WL 3429669, at *2.

**IV. Judgment**

Based on the foregoing this Court finds that the United States has shown its entitlement to a Default Judgment of Forfeiture as to David William Inglis, Grace McGiltha Inglis, the Daughter of David William Inglis, and all persons or entities who may claim an interest in the defendant property and Final Judgment of Forfeiture as to the $34,000.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Default Judgment of Forfeiture is entered as to David William Inglis, Grace McGiltha Inglis, the Daughter of David William Inglis, and all persons or entities who may claim an interest in the defendant property in the above-entitled action.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Final Judgment of Forfeiture is entered against the $34,000 in United States Currency.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the defendant property be, and the same is hereby forfeited to the United States of America, and no

/ / /

possessory rights, ownership rights, and no rights, titles, or interests in the property shall exist in any other party.

IT IS HEREBY CERTIFIED, pursuant to 28 U.S.C. § 2465(a)(2), that there was reasonable cause for the seizure or arrest of the defendant property.

Date: 4/17/2020

CLERK OF COURT

Signature of Clerk or Deputy Clerk